# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov
Miami Division

In re:                                                    Case No. 26-15092-CLC
                                                          Chapter 11
DAX INTERNATIONAL BROKERS, INC.

_____Debtor_____/

## MOTION TO REJECT COMMERCIAL LEASE AGREEMENT AND SETTLEMENT AGREEMENT WITH WMG MEDLEY OWNER, LLC

Debtor, DAX INTERNATIONAL BROKERS, INC. (hereinafter referred to as "Debtor"), by and through its undersigned counsel, hereby files its Motion to Reject Commercial Lease Agreement and Settlement Agreement with WMG Medley Owner, LLC (hereinafter referred to as "Creditor"), and in support of the Motion states as follows:

## BACKGROUND

1.      On April 22, 2026, Debtor initiated this case by filing a Voluntary Petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

2.      Debtor is a corporation organized under the laws of the State of Florida. Debtor operates business selling kitchen, bathroom, and flooring products located in Miami-Dade and Broward Counties, Florida.

3.      The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No trustee or examiner as been appointed in this case and no official committee has yet been appointed pursuant to Section 1102 of the Bankruptcy Code.

1

**RELIEF REQUESTED AND GROUNDS FOR RELIEF**

5.      The Debtor is a party to an unexpired commercial lease agreement, which was modified by a settlement agreement between the parties. The Debtor desires to reject these agreements. A true and correct copy of the commercial lease agreement is attached has Exhibit "A". A true and correct copy of the settlement agreement is attached as Exhibit "B". The agreements involve the lease of 8600 NW South River Drive, Unit 7, Medley, Florida.

6.      The Debtor desires to reject the commercial lease agreement and settlement agreement pursuant to Section 365(a) of the Bankruptcy Code. The Debtor, through the exercise of its business judgment, has determined that rejection of the commercial lease agreement and settlement agreement is in the best interest of the Debtor's estate. The Debtor will be reducing its monthly expenses and consolidating certain locations in order maximize efficiency and profitability.  A rejection of the commercial lease agreement and settlement agreement benefits the estate as it will save the Debtor on its monthly post-petition obligations. The Debtor is surrendering the property to the Creditor on or about May 18, 2026.

7.      Pursuant to Section 365(a) of the Bankruptcy Code, as debtor in possession, may reject the commercial lease agreement and settlement agreement, subject to this Court's approval of the rejection. The Court should approve rejection by the Debtor if the rejection is made in the exercise of the Debtor's sound business judgment, and if such rejection benefits the Debtor's estate. *See e.g.*, *Sharon Steel Corp. v. National Fuel Gas Distr. Corp.*, 872 F.2d 36, 39 (3d Cir. 1989); *In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984); *In re Patterson*, 119 B.R. 59 (Bankr. E.D. Pa. 1990).  It is enough if the Debtor determines in its business judgment that a benefit will be realized.  *Sharon Steel Corp.*, 872 F.2d at 39 (citing *In re Wheeling-*

2

*Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)).   The business judgment standard requires that the Court approve the Debtor's business decision unless that judgment is the product of bad faith, whim or caprice.  *Lubrizol Enterprises v. Richmond Metal Finishes*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

8.      The Debtor's rejection of the commercial lease agreement and the settlement agreement comply with the provisions of Section 365(a) of the Bankruptcy Code and satisfies the business judgment standard for the reasons set forth in Paragraph 8 above. The Debtor's estate will benefit by eliminating unnecessary costs to the estate from the financial obligations currently in place under the commercial lease agreement and the settlement agreement. The Debtor has determined that the location is not sufficiently profitable to the Debtor's current operations to warrant the continued expense. The Debtor's estate will benefit from not having to pay the rent expense for the location. Allowing the rejection of the commercial lease agreement and the settlement agreement will avoid the accrual of post-petition obligations.

**WHEREFORE**, Debtor, DAX INTERNATIONAL BROKERS, INC., respectfully requests the entry of an order authorizing the Debtor to reject the commercial lease agreement and the settlement agreement described above with WMG Medley Owner, LLC, and for such other and

Respectfully Submitted,

*/s/ Nicholas G. Rossoletti, Esq.*
NICHOLAS G. ROSSOLETTI
Florida Bar No. 0051466
Proposed Attorneys for Debtor
**BILU LAW, P.A.**
2760 W ATLANTIC BLVD
POMPANO BEACH, FL  33069
Telephone: (954) 596-0669
Fax: (954) 427-1518
nrossoletti@bilulaw.com
genesis@bilulaw.com

3

# EXHIBIT "A"

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

## LEASE AGREEMENT

THIS LEASE AGREEMENT is dated this 13th day of March, 2025 (the "Effective Date"), between WMG Medley Owner, LLC, a Florida limited liability company ("Landlord"), and DAX International Brokers, Inc., a Florida corporation ('Tenant").

| | |
|---|---|
| **Tenant:** | DAX International Brokers, Inc., a Florida corporation |
| **Tenant's Address:** | 8600 NW South River Drive, Unit 7<br>Medley, FL 33166<br>Attn: Diego Capurro<br>Email: diegocapurro@daxinternationalbrokers.com |
| **Landlord's Address:** | 347 NE 5th Avenue<br>Delray Beach, FL 33483<br>Attn: Anthony Scavo |
| **Premises:** | Unit(s) 7 of the building ("Premises") located at 8600 NW South River Drive, Medley, Florida ("Building") containing approximately 19,570 rentable square feet, as determined by Landlord, as shown on **Exhibit A.** The square footage is an estimate and not guaranteed by Landlord to be the actual square footage of the Premises. In the event the square footage is determined to not accurately reflect the actual square footage of the Premises, neither party shall be entitled to any adjustment of Rent. |
| **Project:** | BaySpace Medley, consisting of a total of 164,970 rentable square feet |
| **Tenant's Proportionate Share of Project:** | 11.863% |
| **Lease Term:** | Beginning on July 1, 2025 (the "Commencement Date") and ending on November 30, 2030. In the event that Tenant does not give Landlord written notice at least one hundred eighty (180) days prior to the end of the initial Lease Term, this Lease shall automatically renew for sixty (60) months and Base Rent shall begin at $20.00 PSF and thereafter increase by five percent (5%) annually. The renewal Lease Term shall be upon the terms, covenants and agreements set forth in this Lease, provided, however: (i) Landlord shall not be obligated to provide/pay any free rent, rental concessions, inducements or allowances; (ii) Landlord shall have no construction or other similar obligations; and (iii) Tenant will accept the Premises on an "as is, where is, and with all faults" basis on the first (1st) day of the renewal Lease Term. |

**Monthly Base Rent:**

| Months | Base Rent PSF* | Monthly Base Rent* | Annual Base Rent* |
|---|---|---|---|
| 1 | $0.00 | $0.00 | $0.00 |
| 2-13 | $15.00 | $24,462.50 | $293,550.00 |
| 14 | $0.00 | $0.00 | $0.00 |
| 15-26 | $16.00 | $26,093.33 | $313,120.00 |
| 27 | $0.00 | $0.00 | $0.00 |
| 28-39 | $17.00 | $27,724.17 | $332,690.00 |
| 40 | $0.00 | $0.00 | $0.00 |

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

| 41-52 | $18.00 | $29,355.00 | $352,260.00 |
| 53 | $0.00 | $0.00 | $0.00 |
| 54-65 | $19.00 | $30,985.83 | $371,830.00 |

*Exclusive of sales tax

| | |
|---|---|
| **Initial Monthly Operating Expense Payments:** | $11,415.83, plus applicable sales tax. |
| **Security Deposit:** | $75,000.00 ($36,506.16 received, $15,493.84 due upon Tenant's execution of this Lease and an additional $500.00 is due each month until the full Security Deposit in the amount of $75,000.00 is reached). |
| **Guarantor:** | Diego Capurro |
| **Tenant Improvements:** | See Paragraph 5(b). |
| **Improvement Allowance:** | See Paragraph 5(b). |
| **Tenant's Broker:** | N/A |
| **Landlord's Broker:** | N/A |
| **Addenda:** | Rules and Regulations; Exhibit A (Premises); Exhibit B (Guaranty) |

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

1.     **Granting Clause**. In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.

2.     **Acceptance of Premises**. Tenant acknowledges that Tenant has fully inspected the Premises and the Project (and/or that it has been given a full opportunity to inspect and investigate each and every aspect of the Premises and the Project, either independently or through an agent of Tenant's choosing), including all matters relating to governmental and other legal requirements, zoning, use permit requirements and building codes, the physical condition of the Premises and the Project, including the interior, exterior, structure, roof, electrical, plumbing, paving of the parking lot, utilities and environmental aspects of the Project, and all easements and access rights prior to the Effective Date and accepts the Premises in strict "as-is" and with all faults condition. Tenant further acknowledges that Landlord has no obligation of any kind to provide any improvements to the Premises, deliver any personal property to the Premises or otherwise perform any work on the Premises (other than as otherwise expressly set forth in this Lease). No representation or warranty, express or implied, respecting any matter or thing relating to the Premises, the Building, the Project or this Lease have been made to Tenant by Landlord or any person, broker or representative other than as may be expressly set forth in this Lease. To the extent permitted under applicable law, Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. Except as expressly provided in Paragraph 10, in no event shall Landlord have any obligation for any defects (patent or latent) in the Premises. The execution of this Lease, as well as the taking of possession of the Premises, shall each be conclusive evidence that Tenant accepts the Premises.

3.     **Use**.

(a)     Subject to Tenant's compliance with all zoning ordinances and Legal Requirements (as hereinafter defined), the Premises shall be used only for the purpose of a showroom and warehouse in connection with a kitchen and bathroom fixtures business and for such other lawful purposes as may be incidental thereto. Tenant shall not conduct or give notice of any auction, liquidation, or going out of business sale on the Premises. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Premises or subject the Premises to use that would damage the Premises. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Landlord or any tenants of the Project. Outside storage, including without limitation, storage of trucks and other vehicles, is prohibited without Landlord's prior written consent, which consent may be withheld in the Landlord's sole discretion for any reason or for no reason at all.

(b)     Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans with Disabilities Act, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "Legal Requirements"). The Premises shall not be used as a place of public accommodation under the Americans with Disabilities Act or similar state statutes or local ordinances or any regulations promulgated thereunder, all as may be amended from time to time. Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, which are required by Legal Requirements related to Tenant's specific use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, increase the insurance risk, or cause the disallowance of any sprinkler credits. If any increase in the cost of any insurance on the Premises or the Project is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall promptly pay the amount of such increase to Landlord as additional rent due under this Lease. Any entrance into or occupation of the Premises by Tenant prior to the Commencement Date shall be subject to all obligations of Tenant under this Lease.

(c)     Tenant and its employees and invitees shall have the non-exclusive right to use, in common with others, any areas designated by Landlord from time to time as common areas for the use and enjoyment of all tenants and occupants of the Project, subject to such reasonable rules and regulations as Landlord

3

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

may promulgate from time to time. To the extent there is no direct conflict with other specific provisions of this Lease, and so long as Landlord is acting in good faith and provides advance written notice to Tenant, Landlord reserves the right to place in, under, over or through the Premises pipes, wires, conduits, lines, vents, ducts and mechanical equipment serving the Premises and other parts of the Project, provided such right is exercised in a manner which does not materially and unreasonably interfere with Tenant's conduct of its business at the Premises. Landlord shall further have the right, so long as Landlord is acting in good faith and provides advance written notice to Tenant, to (i) change the arrangement and location of entrances and other common areas of the Project; (ii) relocate parking areas (if any) designated for Tenant's use and to restrict parking by tenants, their officers, agents and employees to employee parking areas (if any) or to temporarily close all or portions of the parking areas as reasonably required in order to effectuate repairs, upgrades and/or replacements of the parking areas; (iii) exclusively use and/or lease the sidewalks and other areas; (iv) make alterations or additions to, or demolish any part of, the Project; (v) build other buildings or improvements in or about the Project; (vi) convey to others or withdraw portions of the Project; and (vii) do and perform such other acts in and to said areas and improvements as, in the use of reasonable business judgment, Landlord shall determine to be advisable; provided that no such acts or changes shall materially and adversely interfere with the current use and ingress to or egress from the Premises for extended and unreasonable periods of time. In addition to the foregoing, Landlord, so long as Landlord is acting in good faith and provides advance written notice to Tenant, shall have the unfettered right to close down or restrict access to all or any part of the common areas on a temporary basis to make such alterations, modifications or repairs to the Project as shall be advisable in Landlord's sole discretion. Landlord's exercise of any or all of the foregoing rights shall not constitute an eviction, actual or constructive, or a disturbance of Tenant's business or use or occupancy of the Premises.

(d)     Landlord reserves the right to grant anyone the exclusive right to conduct any particular business in the Project. Tenant does not rely on, nor does Landlord represent that the intended use of any specific tenant(s), now or in the future shall continue to be exclusive after the expiration of such tenant's current term, and any renewal or extension thereof contained in such tenant's lease. Landlord reserves the right to change, at any time and from time to time, the name or street address of the Project. It is a material inducement to the Landlord to enter into this lease with Tenant, that Tenant has no third-party beneficiary rights in connection with any other lease in the Project and Tenant has no right to require Landlord to enforce any particular provision of any other tenant lease.

4.      **Base Rent**. Tenant shall pay Base Rent in the amount set forth on the first page of this Lease plus applicable sales tax with respect thereto (all references to Base Rent in this Lease shall constitute a reference to Base Rent plus applicable sales tax with respect thereto). It is a material inducement to Landlord to enter into this Lease that in the event Tenant elects to pay any sums due under this Lease by credit card using the Landlord's e-payment portal, Tenant herewith agrees to pay and shall be responsible for any credit processing fee charged by the credit card company for such payments. In the event that Tenant's credit card company shall subsequently reverse or deny payment to Landlord for any reason, Tenant shall be responsible for all charges incurred by Landlord through its bank or credit card processing facilitator. It is a further material inducement to Landlord to accept payments via credit card, absent which Landlord would not agree to accept payment via credit card. Any payment tendered via credit card by Tenant shall be made via Landlord's e-payment portal. No "pay by phone" or other presentation of Tenant's credit card to Landlord or its property manager shall be permitted. The first month's Base Rent, the Security Deposit, and the first monthly installment of estimated Operating Expenses (as hereafter defined) shall be due and payable on the Effective Date, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the first day of each and every consecutive calendar month succeeding the Commencement Date. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be payable at such address as Landlord may specify from time to time by written notice delivered in accordance herewith. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except where expressly provided in this Lease. Tenant acknowledges that late payment by Tenant to Landlord of any rent due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to determine. Therefore, if Tenant is

4

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

delinquent in any monthly installment of Base Rent, estimated Operating Expenses or other sums due and payable hereunder for more than five (5) days, Tenant shall pay to Landlord a late charge equal to five percent (5%) of such delinquent sum. If Tenant is delinquent in any monthly installment of Base Rent, estimated Operating Expenses or other sums due and payable hereunder for more than ten (10) days, Tenant shall pay to Landlord a late charge equal to ten percent (10%) of such delinquent sum. If Tenant is delinquent in any monthly installment of Base Rent, estimated Operating Expenses or other sums due and payable hereunder for more than fifteen (15) days, Tenant shall pay to Landlord a late charge equal to fifteen percent (15%) of such delinquent sum. In addition to the foregoing late charges, Landlord shall be entitled to receive interest as set forth in Paragraph 37. The parties agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of such late payment by Tenant. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. Payment of such late fee shall not excuse or waive the late payment of Rent.

5.    **Condition of Premises; Tenant's Improvements; Improvement Allowance**.

(a)    Tenant acknowledges that it is familiar with the Premises and accepts same "AS IS". Tenant agrees to perform all work necessary and advisable for Tenant to operate its business at the Premises.

(b)    Landlord shall provide Tenant with a one (1) time allowance, to be used within six (6) months following the date of this Lease and not to exceed Ten Thousand and 00/100 Dollars ($10,000.00) ("Improvement Allowance"), to be used towards the following work, which will be performed by Tenant: (i) installation of a new HVAC unit; and/or (ii) LED light fixtures (collectively, "Tenant's Improvements"). Any such Tenant's Improvements shall be pre-approved by Landlord prior to the commencement of same. Following the completion of Tenant's Improvements, Tenant shall be required to submit an invoice to Landlord, with documentation reasonably acceptable to Landlord evidencing the cost of Tenant's Improvements, for reimbursement, along with any applicable lien waivers and warranties in connection with Tenant's Improvements. Any amount in excess of the Improvement Allowance shall be paid by Tenant at Tenant's sole cost and expense.

6.    **Operating Expense Payments**.

(a)    During each month of the calendar year 2025, as additional rent and on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to $7.00 per square foot of leased space, as estimated by Landlord to be Tenant's Proportionate Share of Operating Expenses (as defined below) for the Project. Payments thereof for any fractional calendar month shall be prorated. On or before the end of the first quarter of each calendar year, Landlord shall submit a statement setting forth Landlord's then current estimate of Taxes (as defined below) and Tenant's Proportionate Share (as defined below) of Operating Expenses (as defined below) (the "Annual Estimate"). During the period between the first day of a calendar year and the time that Landlord furnishes Tenant with the Statement of the Annual Estimate, Tenant shall continue to pay such items based upon the preceding lease year's Annual Estimate. Tenant shall pay to Landlord with Base Rent on the first day of each month following receipt of such statement, until Tenant's receipt of a succeeding statement, an amount equal to one-twelfth (1/12) of the Annual Estimate. From time to time, Landlord may revise the Annual Estimate and adjust Tenant's monthly payments to reflect Landlord's then current revised estimate. Within approximately one hundred eighty (180) days after the end of each calendar year, or as soon thereafter as is feasible, Landlord shall submit a statement showing (1) Tenant's Proportionate Share of Operating Expenses, (2) the actual Real Estate Taxes, and (3) the aggregate amount of Tenant's estimated payments made on account of the Annual Estimate (the "Statement"). If such Statement indicates that the aggregate amount of such estimated payments exceeds Tenant's actual liability, then Landlord shall credit the net overpayment toward Tenant's next estimated payment(s) pursuant to this section. If such Statement indicates that Tenant's actual liability exceeds the aggregate amount of such estimated payments, then Tenant shall pay the amount of such excess as additional rent within fifteen (15) days after receipt of such Statement. Any delay of Landlord in delivering any of the foregoing estimates or statements shall not constitute a waiver of any Landlord's rights under this Lease or in any way impair the continuing obligations of Tenant under this Lease.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

(b)     The term "Operating Expenses" means the sum of all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to, costs of: common area utilities and utilities serving any portion of the Project which is not separately metered for use by a particular tenant; janitorial services for the common areas of the Project, maintenance, repair and replacement of all portions of the Project, including without limitation, window cleaning, elevator maintenance, pest control, access control, paving and parking areas, roads, roofs, roof membrane, alleys, and driveways; mowing, landscaping, and exterior painting; waste collection, the cost of maintaining utility lines, fire sprinklers and fire protection systems, exterior lighting and mechanical and building systems serving the Building or Project; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association to which the Project is subject; fees payable to tax consultants and attorneys for consultation and contesting taxes; environmental insurance or environmental management fees; premiums and other charges for insurance, including the cost of any insurance deductibles for insurance required to be maintained by Landlord hereunder; property management fees payable to a property manager, including any affiliate of Landlord, an administrative fee equal to fifteen percent (15%) of Operating Expenses as a fixed administrative fee for Landlord; security services, if any; trash collection, sweeping and removal; and additions or alterations made by Landlord to the Project or the Building in order to comply with Legal Requirements (other than those expressly required herein to be made by Tenant) or that are appropriate to the continued operation of the Project or the Building as a warehouse/industrial facility in the market area, provided that the cost of such additions or alterations that are required to be capitalized for federal income tax purposes shall be amortized on a straight line basis over a period equal to the lesser of the useful life thereof for federal income tax purposes or ten (10) years and included in Operating Expenses only to the extent of the amortized amount for the respective calendar year. In addition, Operating Expenses shall include: (i) Taxes (hereinafter defined) for each calendar year during the Lease Term, and (ii) the cost of insurance maintained by Landlord for the Project for each calendar year during the Lease Term.

(c)     Notwithstanding the foregoing, Operating Expenses do not include (i) costs, expenses, depreciation or amortization for capital repairs and capital replacements required to be made by Landlord under Paragraph 10 of this Lease; (ii) debt service under mortgages or ground rent underground leases; (iii) costs of restoration to the extent of net insurance proceeds received by Landlord with respect thereto; (iv) leasing commissions or the costs of renovating space for tenants; or (v) any costs or legal fees incurred in connection with any particular tenant. The cost of any repairs or replacements which are classified as capital improvements under generally accepted accounting principles shall be amortized with interest over the lesser of the useful life of the improvement or ten (10) years and included in Operating Expenses only to the extent of the amortized amount for the respective calendar year.

(d)     For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the date of expiration of this Lease.

(e)     With respect to Operating Expenses which Landlord allocates to the entire Project, Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share of the Project as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Project. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Project or Building that includes the Premises or that varies with occupancy or use. The estimated Operating Expenses for the Premises set forth on the first page of this Lease are only estimates, and Landlord makes no guaranty or warranty that such estimates will be accurate.

(f)     Notwithstanding any provision of this Section 6 to the contrary, if the Project is less than 95% leased and/or occupied during any calendar year, an adjusting shall be made so that the Operating expenses shall be computed for such year as though 95% of the Project had been leased and occupied during such year.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

7.     Utilities. Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, internet, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause, at Tenant's expense, any utilities to be separately metered or charged directly to Tenant by the provider. Tenant shall pay its share of all charges for jointly metered utilities based upon consumption, as reasonably determined by Landlord. No interruption or failure of utilities shall result in the termination of this Lease or the abatement of rent or constitute a default or a constructive or actual eviction by Landlord under this Lease and Landlord shall not be liable to Tenant in damages or otherwise for same. Landlord is not obligated to provide any utility or service except as expressly set forth in this Lease.

8.     Taxes. Landlord shall pay all taxes, assessments and governmental charges (collectively referred to as "Taxes") that either (a) accrue against the Project during the Lease Term if such Taxes are payable in advance, or (b) are assessed against the Project during the Lease Term if such Taxes are payable in arrears. Taxes shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 6 hereof during each year of the Lease Term, based upon Landlord's reasonable estimate of the amount of Taxes, and shall be subject to reconciliation and adjustment pursuant to Paragraph 6 once the actual amount of Taxes is known. Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof and any costs incurred in such contest may be included as part of Taxes. All capital levies or other taxes assessed or imposed on Landlord upon the rents payable to Landlord under this Lease and any franchise tax, any excise, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord monthly in estimated installments or upon demand, at the option of Landlord, as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder. If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant, and if any such taxes are levied or assessed against Landlord or Landlord's property and (a) Landlord pays them or (b) the assessed value of Landlord's property is increased thereby and Landlord pays the increased taxes, then Tenant shall pay to Landlord such taxes within ten (10) days after Landlord's request therefor.

9.     Insurance.

(a)     Landlord shall maintain all risk property insurance covering the full replacement cost of the Building or Buildings (excluding foundations), less a commercially reasonable deductible if Landlord so chooses. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, commercial liability insurance, flood insurance, environmental insurance and rent loss insurance. All such insurance shall be included as part of the Operating Expenses charged to Tenant pursuant to Paragraph 6 hereof. The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the insurer's cost calculations). Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises.

(b)     Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing during the Lease Term, Tenant, at its expense, shall obtain and maintain in full force the following insurance coverage: (i) all risk property insurance covering the full replacement cost of all property and improvements installed or placed in the Premises by Tenant or for Tenant's benefit; (ii) worker's compensation insurance with no less than the minimum limits required by law; (iii) employer's liability insurance in an amount not less than $1,000,000 for each incident; and (iv) commercial liability insurance, with a minimum limit of $1,000,000 per occurrence, $2,000,000 general aggregate and a minimum umbrella limit of $3,000,000, for a total minimum combined general liability and umbrella limit of $5,000,000

7

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

(together with such additional umbrella coverage as Landlord may reasonably require) for property damage, personal injuries, or deaths of persons occurring in or about the Premises.  If Tenant is exempt from the requirement to provide worker's compensation coverage, Tenant shall provide Landlord with proof of such exemption from the Florida Division of Worker's Compensation. Landlord may from time to time require reasonable increases in any such limits. The commercial liability policies shall be primary and non-contributory, name Landlord and Landlord's agents and the holder of any mortgage on the Project as additional insureds and/or loss payees (as applicable), insure on an occurrence and not a claims-made basis, be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless thirty (30) days prior written notice shall have been given to Landlord, contain a hostile fire endorsement or amended pollution endorsement, and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such certificates, or at Landlord's option, copies of the policies evidencing coverage shall be delivered to Landlord by Tenant at least ten (10) days prior to the Commencement Date and at least fifteen (15) days prior to each renewal of said insurance. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord copies of such policies and certificates evidencing the coverage required herein, Landlord, in addition to any remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of fifteen percent (15%) of the cost, which, if obtained by Landlord shall be due from Tenant to Landlord as additional rent.

(c)      The all-risk property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against. The failure of a party to insure its property shall not void this waiver. Notwithstanding anything to the contrary contained herein, Tenant hereby waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder (whether by self-insurance or otherwise), regardless of whether the negligence or fault of Landlord caused such loss. Landlord hereby waives any claims against Tenant, and its officers, directors, employees, managers, agents, invitees and contractors for any loss or damage insured against or required to be insured against hereunder to the extent insurance proceeds are received therefor, regardless of whether the negligence or fault of Tenant caused such loss; however, Landlord's waiver shall not apply to any deductible amounts maintained by Landlord under its insurance.

10.      **Landlord's Repairs**. Landlord's maintenance and repair obligations are limited to the replacement of the Building's roof and maintenance of the foundation piers and structural members of the exterior walls, reasonable wear and tear and uninsured losses but specifically excluding any damages caused by Tenant, its agents, employees and contractors. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries, all of which shall be maintained and replaced (as necessary) by Tenant. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10, after which Landlord shall have a reasonable opportunity to commence efforts to repair such item. Landlord shall also maintain in good repair and condition the parking areas and other common areas of the Building, including, but not limited to driveways, alleys, landscape and grounds surrounding the Premises, the cost of such maintenance, repair and replacement to be paid in accordance with Paragraph 6 hereof. Landlord shall have no obligation to make any repairs or replacements brought about by any act, omission or neglect of Tenant or its agents, contractors, employees or invitees.

11.      **Tenant's Repairs**.

(a)      Except for the repairs and maintenance Landlord is obligated to make pursuant to Paragraph 10, Tenant, at its sole expense, shall promptly repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock, dock equipment and loading areas, dock doors, roll-up doors, plumbing, water, and sewer lines up to points of common connection, entries, doors, ceilings, windows, interior walls, and the interior side of demising walls, and heating, ventilation and air conditioning systems, and other building and

8

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

mechanical systems serving the Premises. Maintenance and repair of the heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises, and any repairs to the roof, shall be at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's written election, by Landlord (but at Tenant's expense). The scope of services and contractors under such maintenance service contracts shall be subject to Landlord's prior written approval.

(b)     Tenant shall, at Tenant's expense, enter into and maintain a maintenance service contract with a licensed heating and air-conditioning contractor approved or designated by Landlord, and shall provide a copy thereof to Landlord within five (5) business days after the Effective Date and within five (5) business days after the execution of any subsequent maintenance service contract or modification to any then existing contract. Such contract shall: (i) require compliance with all manufacturers' recommendations pertaining to the HVAC equipment; (ii) require the HVAC contractor to provide a copy of all inspections and maintenance reports pertaining to the HVAC equipment to Landlord within five (5) business days after issuance of any such reports; and (iii) be responsible for the prompt maintenance, repair and replacement of the HVAC equipment serving the Premises. Within the fifteen (15) day period prior to the expiration or termination of this Lease, Tenant shall deliver to Landlord a certificate from an engineer reasonably acceptable to Landlord certifying that the hot water equipment and the HVAC system are then in good repair and working order. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and shall be reimbursed by Tenant within ten (10) days after Landlord furnishes Tenant with a copy of the bill or invoice for such work. Any such reimbursement from Tenant shall be deemed to be due as additional rent under this Lease. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or invitees and any repair that benefits only the Premises, which sum shall be due as additional rent under this Lease.

(c)     In the event that any repair or maintenance obligation required to be performed by Tenant hereunder may affect the structural integrity of the Building (e.g., roof, foundation, structural members of the exterior walls), prior to commencing any such repair, Tenant shall provide Landlord with written notice of the necessary repair or maintenance and a brief summary of the structural component or components of the Building that may be affected by such repair or maintenance. Within ten (10) business days after Landlord's receipt of Tenant's written notice, Landlord shall have the right, but not the obligation, to elect to cause such repair or maintenance to be performed by Landlord, or a contractor selected and engaged by Landlord, but at Tenant's sole cost and expense. The foregoing sentence is not intended to obligate Tenant to pay for repairs or maintenance to those structural items which are Landlord's responsibility pursuant to Paragraph 10 above, but shall only require Tenant to pay for the repair and maintenance to such structural components to the extent such repair or maintenance is necessitated due to the performance of Tenant's repair and maintenance obligations pursuant to this Paragraph 11.

(d)     Tenant, at its expense, shall provide all janitorial services required for a neat and clean operation of the business in and from the Premises, including, without limitation, the cleaning of the Premises at all times during Tenant's normal business hours.

(e)     If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within ten (10) days after demand therefor. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors or invitees and any repair that benefits only the Premises.

12.     **Tenant-Made Alterations and Trade Fixtures.**

(a)     Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations.

9

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

(b)      All Tenant-Made Alterations shall be: (i) constructed in a good and workmanlike manner using new materials only by contractors reasonably acceptable to Landlord and only good grades of materials shall be used; (ii) pursued diligently without interruption to completion; and (iii) performed in a manner to as not to interfere with the business or operations of Landlord or any other occupant of the Project. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval. All contractors must be licensed and carry insurance in amounts and by insurer's satisfactory to Landlord. Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction not to exceed ten percent (10%) of the total cost of such Tenant-Made Alterations. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations.

(c)      If requested by Landlord, Tenant or Tenant's contractor shall obtain a non-conditional payment and performance bond to secure the performance of Tenant-Made Alterations in form and content acceptable to Landlord. Any Tenant-Made Alterations made by Tenant without the prior consent of Landlord or not made in accordance with the plans and specifications approved by Landlord will, if requested by Landlord, be promptly removed by Tenant at Tenant's expense. Neither Tenant, or any person or entity acting under the direction or control of Tenant, will be permitted on any roof in the Project for any purpose, without the express written approval of Landlord in each instance (which may include the imposition of conditions on such roof access).

(d)      Tenant will not install or use any electrical or other equipment or electrical connections which may overload the existing utility systems and facilities or any equipment which may exceed the floor load capacity of that portion of the Premises. If necessary, Tenant will, at Tenant's expense, make whatever changes to the utility systems and equipment as are necessary to comply with the requirements of Landlord and applicable laws.

(e)      Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord lien waivers from all contractors, subcontractors, suppliers and others with lien rights under Section 713, *Florida Statutes*.

(f)      THE TENANT SHALL NOT AND DOES NOT HAVE ANY AUTHORITY TO CREATE ANY LIENS FOR LABOR OR MATERIALS ON THE LANDLORD'S INTEREST IN THE PREMISES OR THE REAL PROPERTY OF WHICH THE PREMISES FORM A PART. ALL PERSONS CONTRACTING WITH THE TENANT FOR THE DESTRUCTION OR REMOVAL OF ANY FACILITIES OR OTHER IMPROVEMENTS OR FOR THE ERECTION, INSTALLATION, ALTERATION, CONSTRUCTION OR REPAIR OF ANY FACILITIES OR IMPROVEMENTS IN OR UPON THE PREMISES OR THE REAL PROPERTY OF WHICH THEY ARE A PART ARE HEREWITH PLACED ON NOTICE THAT PURSUANT TO SEC. 713.10, FLORIDA STATUTES, AS IT IS PRESENTLY CODIFIED OR SUBSEQUENTLY AMENDED FROM TIME TO TIME, THAT THE INTEREST OF THE LANDLORD IS NOT SUBJECT TO LIENS FOR ANY SUCH IMPROVEMENTS BY THE TENANT AND THE MAJORITY OF THE LEASES ENTERED INTO FOR THE REAL PROPERTY OF WHICH THE PREMISES ARE A PART EXPRESSLY PROHIBIT SUCH LIENS AND LIABILITY.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

(g)    Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Prior to the expiration or termination of this Lease, Tenant, at its sole expense, shall repair any and all damage caused by such removal.

(h)    Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Prior to the expiration or termination of this Lease, Tenant, at its sole expense, shall remove its Trade Fixtures and shall repair any and all damage caused by such removal. If Tenant does not remove its Trade Fixtures or other improvements at the end of the Term, the Trade Fixtures or other improvements will, at Landlord's option: (i) become the property of Landlord; or (ii) be removed from the Premises, at Tenant's expense, and sold or disposed of by Landlord in such manner as it deems advisable. Tenant hereby irrevocably constitutes Landlord as its attorney in fact, coupled with an interest, for the purpose of executing on Tenant's behalf, any transfer or other documents, including those required under the Uniform Commercial Code, to effectuate the foregoing. Tenant is aware of the Tenant's rights under Sections 715.10 through 715.111, *Florida Statutes*, as presently codified, and herewith makes a knowing and voluntary waiver of all of Tenant's rights respecting abandoned property as those statutes are presently codified or as they may be amended from time to time during the term of this Lease.

13.    **Signs**. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's prior written approval and shall conform in all respects to Landlord's requirements. Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Landlord shall not be required to notify Tenant of whether it consents to any sign until it (a) has received detailed, to-scale drawings thereof specifying design, material composition, color scheme, and method of installation, and (b) has had a reasonable opportunity to review them. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for signs and exterior treatments. If any such item that has not been approved by Landlord is so displayed, then Landlord shall have the right to remove such item at Tenant's expense or to require Tenant to do the same. In the event Landlord shall be required to remove such items as a result of Tenant's failure to do so, any expense incurred by Landlord to accomplish such removal, including attorneys' fees and costs, shall be deemed additional rent due from Tenant to Landlord under this Lease. Any such expenses incurred by Landlord shall be due and payable within five (5) days from Landlord furnishing Tenant with bills or invoices for such removal costs and attorneys' fees and costs. Such reimbursements, due as additional rent, shall be subject to the provisions set out in Paragraph 4 and Paragraph 37 of this Lease for untimely payment of rent. Provided that it does not materially interfere with Tenant's signage, Landlord reserves the right to affix, install and display signage on any part of the exterior or interior of the Project and the Premises.

14.    **Parking**. Landlord agrees to make available to Tenant nine (9) parking spaces (unassigned) for use by Tenant, its employees and customers. So long as Tenant is not in default under this Lease, Tenant shall have a non-exclusive license to park in common with other tenants of the Project in those areas designated for non-reserved parking. Landlord shall have the right, in its sole discretion, to designate parking spaces for the exclusive use of a particular tenant or tenants. All parking for Tenant and its employees, suppliers, customers and guests shall be on a first come, first served basis. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Landlord shall have the right to institute

11

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

reasonable procedures and/or methods to enforce the terms of this Paragraph 14, including, but not limited to, a card access system, the hiring of parking attendants or a management company.

15.     **Restoration**.

(a)     If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within sixty (60) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed 180 days from the date Landlord receives all permits, approvals, and licenses required to begin reconstruction, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than thirty (30) days after Landlord's notice. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take 180 days or less from the date Landlord receives all permits, approvals and licenses required to begin reconstruction, then, subject to receipt of sufficient insurance proceeds, Landlord shall restore the Premises excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Whether or not Landlord elects to repair said damage and render the Premises tenantable, all insurance proceeds available to Tenant for the cost thereof, including the Tenant-Made Alterations (except to the extent actually used by Tenant to repair or replace the Tenant-Made Alterations), shall be paid directly to Landlord. Base Rent and Operating Expenses shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

(b)     If the Premises are destroyed or substantially damaged by any peril not covered by the insurance maintained by Landlord or any Landlord's mortgagee requires that insurance proceeds be applied to the indebtedness secured by its mortgage (defined hereinafter), Landlord may terminate this Lease by delivering written notice of termination to Tenant within sixty (60) days after such destruction or damage or such requirement is made known by any such Landlord's mortgagee, as applicable, whereupon all rights and obligations hereunder shall cease and terminate, except for any liabilities of Tenant which accrued prior to Lease termination. If this Lease is terminated, then all rent shall be apportioned (based on the portion of the Premises which is usable for normal business operations after such damage or destruction) and paid to the date of termination.

(c)     If such damage or destruction is caused by the act(s) or omission(s) of Tenant, its employees, agents, invitees or contractors, Tenant shall pay to Landlord with respect to any damage to the Premises and/or Project the amount of the deductible under Landlord's insurance policy within ten (10) days after presentment of Landlord's invoice and Tenant shall not be entitled to any abatement of Base Rent or Operating Expenses, which sum shall be due as additional rent under this Lease. Tenant's failure to pay within ten (10) days shall subject such amount to the provisions of Paragraph 4 and Paragraph 37 of this lease respect untimely payment of rent.

(d)     If the Premises or any part of the Project is damaged, regardless of the extent thereof, during the last twenty-four (24) months of the Term, Landlord may elect to terminate this Lease by giving written notice to Tenant within ninety (90) days after the date of occurrence of such damage.

16.     **Condemnation**. If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and (a) the Taking would prevent or materially interfere with Tenant's use of the Premises, (b) in Landlord's judgment would materially interfere with or impair its ownership or operation of the Project or (c) as a result of such Taking, Landlord's mortgagee accelerates the payment of any indebtedness securing all or a portion of the Project, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the

12

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances (based on a reduction in rent calculated on a pro rata basis based on the reduced square footage), and Landlord shall restore the Premises to its condition prior to the Taking; provided, however, Landlord's obligation to so restore the Premises shall be limited to the award Landlord receives in respect of such Taking that is not required to be applied to the indebtedness secured by a mortgage. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

17.     **Assignment and Subletting**.

(a)     Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises nor any part thereof or mortgage, pledge, nor hypothecate its leasehold interest nor grant any concession or license within the Premises (each being a "Transfer") and any attempt to do any of the foregoing shall be void and of no effect ab initio. For purposes of this Paragraph 17, a transfer of the ownership interests controlling Tenant shall be deemed a Transfer of this Lease unless such ownership interests are publicly traded. The sale of all or substantially all of Tenant's assets shall also be deemed a Transfer requiring Landlord's prior written consent. At least thirty (30) days prior to the Transfer, Tenant shall furnish Landlord with (a) all documents related to the Transfer; (b) all financial statements of the proposed transferee, including, but not limited to, the most recent income, balance sheet and changes in financial position statement (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by transferee's certified public accountant if available; (c) any other relevant information that Landlord has theretofore reasonably requested regarding the proposed transfer; and (d) a statement signed by an authorized officer of an assignee, in the case of an assignment, agreeing that the assignee will be liable for all obligations thereafter arising under this Lease; and (e) an application fee of $2,500 which the parties agree is a fair and reasonable estimate of the costs that Landlord will incur by reason of such transfer application. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any Transfer. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

(b)     Notwithstanding any Transfer, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such Transfer). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant.

(c)     If this Lease is assigned or if the Premises is subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding subparagraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant

13

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

of its covenants, duties, or obligations hereunder. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers.

(d)    Landlord and Tenant agree that it shall not be unreasonable for Landlord to withhold its approval to any proposed Transfer for any of the following reasons: (i) the contemplated use of the Premises by the proposed transferee is not substantially identical to the permitted use; or (ii) the net worth and/or financial capability of the transferee is, or may become, inadequate to operate the business permitted to be conducted in the Premises in the manner required hereunder and/or to meet all of Tenant's financial and other obligations hereunder; or (iii) the transferee's reputation (or that of any of its affiliates) would have an adverse effect upon the reputation of the Project or the other businesses located thereon; or (iv) the nature of the transferee's proposed use of the Leased Premises would involve any increased risk of the use, release, disposition or mishandling of "Hazardous Materials" or increase the risk of air quality conditions; or (v) any Lender whose approval of such Transfer is required fails to approve the Transfer; or (vi) the Transferee does not satisfy Landlord's or Lender's then existing criteria for leases in the Project.

(e)    Landlord may condition its approval of any Transfer upon: (i) the transferee supplying personal guaranties satisfactory to Landlord; and (ii) increasing/posting a security deposit (not to exceed three (3) months' Base Rent) or other financial security satisfactory to Landlord. Landlord may, at Landlord's option, require transferee to execute Landlord's then-current standard lease form.

18.    **Indemnification**. In consideration of the sum of $100.00 in hand paid by Landlord, the receipt and sufficiency of which is hereby acknowledged, Tenant agrees to indemnify, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord, and Landlord's agents, managers, officers, employees and contractors, from and against any and all claims, demands, losses, liabilities, causes of action, suits, judgments, damages, costs and expenses (including reasonable attorneys' fees in all pre-suit negotiations and in all trial, post-judgment or appellate proceedings) arising from any occurrence on or about the Premises, the use and occupancy of the Premises, or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or the Project or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents, or from Tenant's failure to perform its obligations under this Lease, EVEN THOUGH CAUSED OR ALLEGED TO BE CAUSED BY THE JOINT, COMPARATIVE, OR CONCURRENT NEGLIGENCE OR FAULT OF LANDLORD OR ITS AGENTS, AND EVEN THOUGH ANY SUCH CLAIM, CAUSE OF ACTION, OR SUIT IS BASED UPON OR ALLEGED TO BE BASED UPON THE STRICT LIABILITY OF LANDLORD OR ITS AGENTS. THIS INDEMNITY PROVISION IS INTENDED TO INDEMNIFY LANDLORD AND ITS AGENTS AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT AS PROVIDED ABOVE WHEN LANDLORD OR ITS AGENTS ARE JOINTLY, COMPARATIVELY, OR CONCURRENTLY NEGLIGENT WITH TENANT. This indemnity provision shall survive termination or expiration of this Lease. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's obligations under this Paragraph 18. Notwithstanding the foregoing provisions of this Paragraph 18, Landlord shall not be released from liability for direct damages caused by its intentionally tortious misconduct.

19.    **Inspection and Access**. Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make such repairs as may be reasonably required by Landlord or permitted pursuant to this Lease and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers or, during the last year of the Lease Term, to prospective tenants. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or that the Project is available for sale. Landlord may grant easements, make public dedications, designate common areas and create restrictions on or about the Premises, provided that no such easement, dedication, designation or restriction materially and adversely interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

20.    **Quiet Enjoyment**. If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the

14

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord, but not otherwise.

21.    **Surrender**. No act by Landlord shall be an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Paragraphs 15 and 16 excepted. Any Trade Fixtures, Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives any and all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property, including, without limitation, the notice requirement set forth in Section 714.104, *Florida Statutes*, as presently codified or as may be amended during the term of this Lease. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Operating Expenses and all obligations concerning the condition and repair of the Premises.

22.    **Holding Over**. If Tenant fails to vacate the Premises after the termination of the Lease Term or earlier termination of this Lease, Tenant shall be a tenant at will or at sufferance, and Tenant shall pay, in addition to any other rent or other sums then due Landlord, a daily base rental equal to 200% of the Base Rent in effect on the expiration or termination date. It is a material inducement to Landlord, absent which Landlord would not agree to enter into this Lease, that Tenant agrees that Tenant shall also remain liable for all Operating Expenses incurred during such holdover period. In addition, Tenant shall be liable for all damages (including reasonable attorneys' fees and expenses) of whatever type (including consequential damages) incurred by Landlord as a result of such holding over. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph 22 shall not be construed as consent for Tenant to retain possession of the Premises.

23.    **Events of Default**. Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(i)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due.

(ii)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "Proceeding for Relief"); (C) become the subject of any Proceeding for Relief which is not dismissed within sixty (60) days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(iii)    Any insurance required to be maintained by Tenant pursuant to this Lease shall not be in place or be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease, after seven (7) days' notice and opportunity to cure.

(iv)    Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(v)    Tenant shall fail to discharge or transfer to security pursuant to Section 713.24, *Florida Statutes*, as presently codified or as amended during the term of this Lease, any lien placed upon the

15

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

Premises in violation of this Lease within thirty (30) days after any such lien or encumbrance is filed against the Premises.

(vi)    Tenant shall fail to execute any instrument of subordination or attornment or any estoppel certificate within the time periods set forth in Paragraphs 27 and 29 respectively following Landlord's request for the same.

(vii)    Tenant shall breach any of the requirements of Paragraph 30 and such failure shall continue for a period of five (5) days or more after notice from Landlord to Tenant.

(viii)    Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 23, and except as otherwise expressly provided herein, such default shall continue for more than fifteen (15) days after Landlord shall have given Tenant written notice of such default.

(ix)    Tenant shall fail to comply with any provision or obligation of any other agreement(s) that Tenant has or will enter into with Landlord, including, but not limited to, any former or future lease agreements.

### 24.    **Landlord's Remedies**.

(a)    If there shall be an Event of Default then the provisions of Paragraph 24 shall apply. Landlord shall have the right, without further notice and at its sole option, to terminate this Lease. If necessary, Landlord may proceed to recover possession of the Premises under applicable laws. If Landlord elects to terminate this Lease and/or elects to terminate Tenant's right of possession, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice to Tenant's liability for all rent specified herein and any other amounts owed by Tenant to Landlord. Whether or not this Lease and/or Tenant's right of possession is terminated, Landlord shall have the right, at its sole option, to terminate any renewal or expansion right, or other options contained in this Lease and to grant or withhold any consent or approval pursuant to this Lease in its sole and absolute discretion. Tenant hereby expressly waives, for itself and all persons claiming by, through or under it, any right of redemption, re-entry or restoration of the operation of this Lease under any present or future Law, including any such right which Tenant would otherwise have in case Tenant should be dispossessed for any cause, or in case Landlord should obtain possession of the Premises as herein provided. Landlord may relet the Premises or any part thereof, alone or together with other premises, for such term(s) and on such terms and conditions as Landlord, in its sole and absolute discretion, may determine, but Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet all or any portion of the Premises or to collect any rent due upon such reletting.

(b)    If, as the result of an Event of Default, Tenant's right of possession is terminated in any way, Landlord and Tenant agree that Tenant shall pay to Landlord on account of such Event of Default, the following: (i) a sum equal to all delinquent Rent due as of the later of the date of the Event of Default or Tenant's vacating of the Premises; (ii) all reasonable attorneys' fees incurred by Landlord in connection with the Event of Default and pursuit of Landlord's rights and remedies; (iii) all unamortized brokerage commissions; and (iv) as liquidated and agreed damages (and not as a penalty) for future rent (*i.e.*, Base Rent other than that specified in subsection (i) above) and in lieu of Landlord recovering the costs of reletting the Premises and having a duty to mitigate (which is a material consideration to Landlord), a sum equal to 50% of the following: (a) the remaining Base Rent that would have been due under the Lease but for the Default, plus (b) an amount equal to all additional rent due to be paid in the twelve (12) months prior to the Event of Default (or if the Event of Default occurs prior to the end of the first Lease Year, what would have been due during the first Lease Year) multiplied by the number of Lease Years remaining on the Lease Term which amount is stipulated to be a reasonable estimate of Landlord's total damages for future Base Rent, future Additional Rent, reletting costs and market risk (the "Liquidated Damages"). A Lease Year is a period of twelve (12) consecutive calendar months following the Commencement Date if the

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

Commencement Date is the first day of a calendar month, and otherwise on the first day of the first full calendar month following the Commencement Date.

(c)      All rights and remedies of Landlord set forth in this Lease are cumulative and in addition to all other rights and remedies available to Landlord at law or in equity, including those available as a result of any anticipatory breach of this Lease; and (ii) the exercise by Landlord of any such right or remedy shall not prevent the concurrent or subsequent exercise of any other right or remedy. No delay or failure by Landlord to exercise or enforce any of Landlord's rights or remedies or Tenant's obligations shall constitute a waiver of any such rights, remedies or obligations. Landlord shall not be deemed to have waived any default by Tenant unless such waiver expressly is set forth in a written instrument signed by Landlord. Landlord's damages shall be calculated in accordance with applicable laws. If the Liquidated Damages are held unenforceable by a court of competent jurisdiction, then Landlord's damages shall be calculated in accordance with applicable laws, except that Landlord's efforts to mitigate shall not be questioned unless clearly inadequate.

(d)      If Tenant fails to make any payment to any third party or to do any act herein required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act. The taking of such action by Landlord shall not be considered a cure of such Event of Default by Tenant or prevent Landlord from pursuing any remedy it is otherwise entitled to in connection with such Default. If Landlord elects to make such payment or do such act after any required notice and opportunity to cure then all expenses incurred by Landlord, plus interest at the rate of eighteen percent (18%) per annum, from the date incurred by Landlord to the date of payment thereof by Tenant, shall constitute additional Rent due hereunder, and shall be immediately due and payable.

25.      **Tenant's Remedies/Limitation of Liability**. All obligations of Landlord hereunder shall be construed as covenants, not conditions, and Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease or arising out of the relationship between Landlord and Tenant shall be limited solely to Landlord's interest in the Building, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord.

26.      **Waiver of Jury Trial**. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF OR IN ANY WAY RELATED TO THE LANDLORD/TENANT RELATIONSHIP, THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

27.      **Subordination**.

(a)      This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. The provisions of this Paragraph 27 shall be self-operative and no further instrument shall be required to effect such subordination or attornment; however, Tenant agrees to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder within ten (10) days of such request. Tenant's obligation to furnish each such instrument requested hereunder in the time period provided is a material inducement for Landlord's execution of this Lease and

17

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

any failure of Tenant to timely deliver each instrument shall be deemed an Event of Default. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded.

(b)    Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust. Tenant waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and Tenant's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the Premises or any portion thereof that includes the Premises or Landlord's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

(c)    Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice in accordance with the provisions of Paragraph 37, specifying the default in reasonable detail to any mortgage holder whose address has been given to Tenant, and affording such mortgage holder a reasonable opportunity to perform Landlord's obligations hereunder. Notwithstanding any such attornment or subordination of a mortgage to this Lease, the holder of any mortgage shall not be liable for any acts of any previous landlord, shall not be obligated to install any tenant improvements, and shall not be bound by any amendment to which it did not consent in writing nor any payment of rent made more than one month in advance.

28.    **Mechanic's Liens**.

(a)    Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost, attorneys' fees and expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such thirty (30) day period. If Tenant fails to timely remove such liens, Landlord may do so and collect all expenses incurred from Tenant plus an administrative charge of fifteen percent (15%).

(b)    No interest of the Landlord in the Project or the Premises is subject to a construction lien pursuant to Section 713, *Florida Statutes*, or any other kind of lien (equitable or otherwise), arising out of Leasehold Improvements or other work contracted for by the Tenant or any person or entity other than the Landlord. This section is intended to invoke the protections provided to landlords pursuant to Section 713.10(2), *Florida Statutes*, as presently codified or as amended during the term of this Lease. Tenant agrees that it shall include notice of this section in all contracts with all persons providing goods or services related to improvements within the Premises or otherwise provide written notice thereof before any goods or services are provided to the Premises.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

29.    **Estoppel Certificates**. Tenant agrees, from time to time, within five (5) days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, the amount of any security deposit(s) and prepaid rent, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease and any failure of Tenant to timely deliver each estoppel certificate shall be deemed an Event of Default. No cure or grace period provided in this Lease shall apply to Tenant's obligation to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within five (5) days after Landlord's written request thereof.

30.    **Environmental Requirements**.

(a)    Except for Hazardous Materials contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture, dispose, or release any Hazardous Material on or from the Premises or about the Project without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and all requirements of this Lease. Tenant shall complete and certify disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises, and Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Premises or Project of any Environmental Requirement.

(b)    The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, permits, authorizations, orders, policies or other similar requirements of any governmental authority, agency or court regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Toxic Substances Control Act and all state and local counterparts thereto, and any common or civil law obligations including, without limitation, nuisance or trespass, and any other requirements of this Lease. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant that is or could be regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material). For purposes of Environmental Requirements, to the extent authorized by law, Tenant is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

(c)    Tenant, at its sole cost and expense, shall immediately remove all Hazardous Materials stored, disposed of or otherwise released by Tenant, its assignees, subtenants, agents, employees, contractors or invitees onto or from the Premises, in a manner and to a level satisfactory to Landlord in its sole discretion, but in no event to a level and in a manner less than that which complies with all Environmental Requirements and does not limit any future uses of the Premises or require the recording of any deed restriction or notice regarding the Premises. Tenant shall perform such work at any time during the period of the Lease upon written request by Landlord or, in the absence of a specific request by Landlord, before Tenant's right to possession of the Premises terminates or expires. If Tenant fails to perform such work within the time period specified by Landlord or before Tenant's right to possession terminates or expires (whichever is earlier), Landlord may at its discretion, and without waiving any other remedy available under this Lease or at law or equity (including without limitation an action to compel Tenant to perform such work), perform such work at Tenant's cost. Tenant shall pay all costs incurred by Landlord in performing such work within ten (10) days

19

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

after Landlord's request therefor. Such work performed by Landlord is on behalf of Tenant and Tenant remains the owner, generator, operator, transporter, and/or arranger of the Hazardous Materials for purposes of Environmental Requirements. Tenant agrees not to enter into any agreement with any person, including without limitation any governmental authority, regarding the removal of Hazardous Materials that have been disposed of or otherwise released onto or from the Premises without the written approval of the Landlord.

(d)    Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the Premises or disturbed in breach of the requirements of this Paragraph 30, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials or any breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph 30 shall survive any termination of this Lease.

(e)    Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. Tenant shall promptly notify Landlord in writing of any communication or report that Tenant makes to any governmental authority regarding any possible violation of Environmental Requirements or release or threat of release of any Hazardous Materials onto or from the Premises. Tenant shall, within five (5) days of receipt thereof, provide Landlord with a copy of any documents or correspondence received from any governmental agency or other party relating to a possible violation of Environmental Requirements or claim or liability associated with the release or threat of release of any Hazardous Materials onto or from the Premises.

(f)    In addition to all other rights and remedies available to Landlord under this Lease or otherwise, Landlord may, in the event of a breach of the requirements of this Paragraph 30 that is not cured within thirty (30) days following notice of such breach by Landlord, require Tenant to provide financial assurance (such as insurance, escrow of funds or third party guarantee) in an amount and form satisfactory to Landlord. The requirements of this Paragraph 30 are in addition to and not in lieu of any other provision in the Lease.

31.    **Rules and Regulations**. Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project. The current rules and regulations are attached hereto. In the event of any conflict between said rules and regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project.

32.    **Security Service**. Tenant acknowledges and agrees that, while Landlord may (but shall not be obligated to) patrol the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

20

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

33.    **Force Majeure**. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, pandemics, epidemics, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, riots, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

34.    **Entire Agreement**. This Lease constitutes the complete and entire agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

35.    **Severability**. If any clause or provision of this Lease is determined to be illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

36.    **Brokers**. Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent, salesperson or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims (including reasonable attorney's fees) by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

37.    **Miscellaneous**.

(a)    Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b)    If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)    All notices required or permitted to be given under this Lease shall be in writing and shall be sent by a reputable national overnight courier service, postage prepaid, or by hand delivery and, if to Tenant, addressed to Tenant at the Premises, and if to Landlord, addressed to Landlord at c/o the general partner of Landlord at the mailing address of Landlord, with a copy via email to ALauer@BasisIndustrial.com. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery.

(d)    Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e)    Tenant and Guarantor, if any, will within ten (10) business days after Landlord's request, furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant and/or Guarantor or Tenant/Guarantor's accountants and any other financial information or summaries that Tenant/Guarantor typically provides to its lenders or shareholders. Landlord shall hold such financial statements and information in confidence, and shall not disclose the same except: (i) to Landlord's lenders or potential lenders, (ii) to potential purchasers of all or a portion of the Project or Landlord's interest in the Project, (iii) otherwise as reasonably necessary for the operation of the Project or administration of Landlord's business or (iv) if disclosure is required by any judicial or administrative order or ruling.

21

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

(f)     Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord, Tenant will execute a memorandum of lease.

(g)     Each party acknowledges that it has had the opportunity to consult counsel with respect to this Lease, and therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)     Any amount not paid by Tenant within five (5) days after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the highest rate permitted by applicable law. It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder. If any check given by Tenant to Landlord is returned for any reason, Tenant shall pay a bad check charge of $250 per occurrence in addition to making the worthless check good. In the event Tenant fails to pay Rent or any other sums due in full within five (5) days after the same is due, Landlord may require all future payments of Rent thereafter be made by ACH or wire transfer. Landlord and Tenant shall cooperate in establishing the required ACH account.

(k)     Construction and interpretation of this Lease shall be governed by the laws of the state in which the Project is located, excluding any principles of conflicts of laws.

(l)     Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)     All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda (other than the rules and regulations) and the terms of this Lease, such exhibits or addenda shall control. In the event of a conflict between the rules and regulations attached hereto and the terms of this Lease, the terms of this Lease shall control.

(n)     In any dispute arising between the parties related to this Lease, the Guaranty or any action commenced to enforce this Lease or declare the rights hereunder or under the Guaranty, the prevailing party shall be entitled to all reasonable "attorney's fees" and all "costs" actually incurred in all pre-suit negotiations, and in all levels of litigation and in all courts, whether for pre-litigation, litigation, mediation, settlement discussions, investigation of facts and law and in all courts (including appeals), including post-judgment and those incurred establishing an entitlement to or the amount of attorney's fees or costs to which the prevailing party is entitled. In connection with the foregoing, (i) "attorney's fees" shall include fees for all attorneys, paralegals, law clerks and overtime charges for non-professional staff, and (ii) "costs" shall include all charges for court reporters, transcripts, expert witnesses (testifying and consulting), brokerage

22

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

fees for reletting the Premises, appraiser's fees, travel, parking and other charges typically imposed by attorneys on their clients, none of which shall be limited by any uniform guidelines. In addition to the foregoing, if any amount due Landlord by Tenant pursuant to this Lease or otherwise is turned over to a collection agent for collection, the Tenant agrees to pay in addition thereto all fees, whether contingent or otherwise, and costs incurred by Landlord, its successors and/or assigns.

(o)     It is a material inducement to landlord to enter into this Lease with Tenant that Tenant herewith knowingly, voluntarily and expressly waives all of the following: (a) the requirement under Section 83.12, *Florida Statutes* that the plaintiff in a distress for rent action file a bond payable to the tenant in at least double the sum demanded by the plaintiff, it being agreed and understood that no bond shall be required in any such action, or if the Count requires such a bond that the amount of such bond shall not exceed the sum of One Thousand and 00/100 Dollars ($1,000.00); (b) the right of Tenant under Section 83.14, *Florida Statutes* to replevy distrained property; and (c) any rights it may have in the selection of venue in the event of suit by or against Landlord, it being understood that the venue of such suit shall only be in a court of competent jurisdiction in the county in which the Premises is located.

38.     **Limitation of Liability of Landlord's Partners, and Others**. In no event shall Landlord be liable to Tenant for loss of business, special, punitive, exemplary, indirect or consequential damages. It is understood and agreed that the liability of Landlord hereunder shall be limited solely to Landlord's estate and interest in the Project; that no partner, member, manager, officer, director, representative, agent or employee of Landlord, unless caused directly and solely by their intentionally tortious conduct, shall be personally liable with respect of any covenant, condition or provisions of this Lease or any claim arising out of or related to this Lease; and that a deficit capital account of a partner or member of Landlord shall not be deemed an asset or property of the Premises. Tenant acknowledges that it is not in privity with and shall have no contractual or quasi-contractual claim against or be owed any contractual duty by any mortgagee.

39.     **Landlord's Security Interest**. Landlord reserves, and is hereby granted, a first and superior lien and security interest (which shall be in addition to and not in lieu of any statutory lien or security interest) on all of the Tenant-Made Alterations, equipment and Tenant's personal property (tangible and intangible) now or hereafter located in or on  the Premises, to secure all sums due from and all obligations to be performed by Tenant under this Lease, which lien and security interest may be enforced by Landlord in any manner provided by law, including, without limitation, under and in accordance with the Uniform Commercial Code applicable in the state in which the Premises are located. Tenant consents to the filing by Landlord of all documents required under such Uniform Commercial Code to perfect the security interest granted in this Paragraph 39.

40.     **Relocation.** During the term hereof, Landlord shall have the right to relocate the Premises to a reasonable location in the Project comparable in size to the Premises and on the same terms and conditions as contained herein.  Tenant shall be allowed to remove all of its leasehold improvements from the Premises pursuant to such relocation provided that Tenant repairs any damage caused by such removal. Landlord shall tender the new location to Tenant in substantially the same condition as the Premises were in when tendered to Tenant.  Landlord may, at its option, terminate this Lease if Tenant refuses to accept said new location. In the event of any such relocation, then, upon the date Landlord delivers the replacement space to the Tenant, (a) the term "Premises" shall be deemed to be the replacement space and the Base Rent and the Tenant's Pro-Rata Share shall be re-computed based on a per square foot basis for the new Premises; and (b) the Tenant shall surrender the "original" Premises within thirty (30) days as provided in the Lease. In the event the Tenant, in his discretion, does not agree with Landlord's designation of suitable alternative space within the Project, the Tenant's sole remedy shall be to terminate this Lease and receive a return of its security deposit.

41.     **Radon Disclosure**. In accordance with the requirements of Section 404.056(6), *Florida Statutes* the following notice is hereby given:

23

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

**RADON GAS:** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon testing may be obtained from your county public health unit.

**END OF PAGE**

24

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:

WMG Medley Owner, LLC,
a Florida limited liability company

By: _Anthony Scavo_
   751EA1CB7C774C8
   Anthony Scavo, its Chief Operating Officer

Date: 3/13/2025

TENANT:

DAX International Brokers, Inc.,
a Florida corporation

By: _____
Name: Alejandro Landazuo
Title: Director
Date: 3/13/25

25

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

## Rules and Regulations

In the event of a conflict between the following Rules and Regulations and the terms of the Lease to which this Addendum is attached, the terms of the Lease shall control.

1. The sidewalk, entries, parking lots, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises. Parking lots may not be used by the tenants to store materials and/or vehicles. The Tenant may not operate business in the parking lot areas.

2. Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project.

3. Except for service animals, no animals shall be allowed in the offices, halls, or corridors in the Project.

4. Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5. If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense and in compliance with all applicable laws, codes and ordinances.

6. Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease. The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7. Parking any type of recreational vehicles is specifically prohibited on or about the Project. Except for the overnight parking of operative vehicles or as expressly permitted in the Lease, no vehicle of any type shall be stored in the parking areas at any time. In the event that a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings. All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

8. Tenant shall, at its own expense, maintain the Premises free from rodents, insects and other pests.

9. Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises or the Project, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11. Tenant shall give Landlord prompt written notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

12.    Tenant shall not permit storage outside the Premises, including without limitation, outside storage of trucks and other vehicles, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.    All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14.    No auction, public or private, will be permitted on the Premises or the Project.

15.    No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16.    The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease. No gaming devices shall be operated in the Premises.

17.    Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18.    Tenant assumes full responsibility for protecting the Premises from theft, robbery, fire and pilferage.

19.    Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20.    Tenant shall not introduce, disturb or release asbestos or PCBs onto or from the Premises.

21.    Tenant shall at all times conduct its operations in a good and workmanlike manner, employing best management practices to minimize the threat of any violation of Environmental Requirements.

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

## Exhibit A

## Premises

8600 NW South River Drive, Unit 7
Medley, FL 33166

19,570 Square Feet

Exhibit A

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

## Exhibit B

## Guaranty

THIS GUARANTY (this "Guaranty") is made as of the date Guarantor signs below by Diego Capurro, having the addresses set forth below ("Guarantor"), to WMG Medley Owner, LLC, a Florida limited liability company ("Landlord").

WHEREAS, Landlord has agreed to lease to DAX International Brokers, Inc., a Florida corporation ("Tenant"), certain space known as Unit 7 (the "Premises") in the project known as Bayspace Medley and which is located at 8600 NW South River Drive, Medley, Florida 33166 (the "Project"), pursuant to that certain Lease Agreement by and between Landlord and Tenant of dates substantially contemporaneously with this Guaranty (the "Lease"); and

WHEREAS, Guarantor is materially benefited by the Lease, and the undertaking by Guarantor to execute and deliver this Guaranty is a material inducement to Landlord to enter into the Lease.

NOW, THEREFORE, Guarantor agrees with Landlord as follows:

All capitalized terms shall have the meaning ascribed to them in the Lease unless otherwise defined in this Guaranty. Guarantor hereby guarantees that all sums stated in the Lease to be payable by Tenant shall be promptly paid in full when due in accordance with the Lease and that Tenant shall perform and observe all of its obligations under the Lease. If any such sum or obligation is not timely paid, performed or observed, then Guarantor shall, promptly after notice thereof and prior to the expiration of any applicable grace period granted to Tenant under the Lease, pay or perform the same regardless of (a) any defense or right of offset or counterclaim which Tenant or Guarantor may have or assert against Landlord, (b) whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person, (c) termination of the Lease as a result of Tenant's default, or (d) any other condition or contingency. Guarantor shall also pay all expenses of collecting any such sum or of otherwise enforcing this Guaranty, including attorneys' fees incurred in all courts. This Guaranty is a guaranty of performance and payment and not merely collection.

This Guaranty is a continuing guaranty, and the obligations of Guarantor hereunder are absolute, irrevocable and unconditional. Except to the extent the obligations of Tenant under the Lease are performed in full, there is no circumstance under which Guarantor shall be discharged from any of its obligations under, or have any defense to the enforcement of, this Guaranty. Without limiting the generality of the foregoing, Guarantor's obligations and covenants under this Guaranty shall in no way be affected or impaired by reason of the happening from time to time of any of the following, whether or not Guarantor has been notified thereof or consented thereto: (a) any invalidity, illegality or unenforceability of the Lease, or any termination of the Lease for any reason whatsoever (including an event of insolvency); (b) any defenses or rights of set-off or counterclaim of Tenant or Guarantor; (c) Landlord's waiver of the performance or observance by Tenant, Guarantor or any other party of any covenant or condition contained in the Lease or this Guaranty; (d) any extension, in whole or in part, of the time for payment by Tenant or Guarantor of any sums owing or payable under the Lease or this Guaranty, or of any other sums or obligations under or arising out of or on account of the Lease or this Guaranty, or the renewal of the Lease or this Guaranty; (e) any full or partial assignment of the Lease or subletting of the Premises; (f) any modification or amendment (whether material or otherwise) of any of the obligations of Tenant or Guarantor under the Lease or this Guaranty; (g) the doing or the omission of any act referred to in the Lease or this Guaranty (including the giving of any consent referred to in the Lease or this Guaranty); (h) Landlord's failure or delay to exercise any right or remedy available to Landlord or any action on the part of Landlord granting indulgence or extension in any form whatsoever; (i) an event of insolvency; (j) the release of Tenant or Guarantor from the performance or observation of any covenant or condition contained in the Lease or this Guaranty by operation of law; or (k) any other matters whatsoever, whether or not similar to those specifically mentioned herein, other than the full performance of all obligations of Tenant under the Lease.

Exhibit B

Docusign Envelope ID: D788B8C5-A4BB-4645-AE45-3823E1499870

Guarantor shall notify Landlord in writing whenever Guarantor shall make any payment to Landlord on account of the liability of Guarantor under this Guaranty. No such payment by Guarantor pursuant to any provision of this Guaranty shall entitle Guarantor, by subrogation, indemnification or otherwise, to the rights of Landlord, to any payment by Tenant, or to any recovery from any property of Tenant. Guarantor waives any right Guarantor may now or hereafter have against Tenant (and/or any other guarantor of Tenant's obligations under the Lease) with respect to this Guaranty (including, any right of subrogation, reimbursement, exoneration, contribution, indemnification or similar right, and any right to participate in any claim, right or remedy of Landlord against Tenant or any security which Landlord now or hereafter has with respect to the Lease), whether such right arises under an express or implied contract, by operation of law, or otherwise. Guarantor shall be deemed not to be a "creditor" (as defined in Section 101 of the Bankruptcy Code) of Tenant by reason of the existence of this Guaranty in the event that Tenant becomes a debtor in any proceeding under the Bankruptcy Code. Should Landlord repay to Tenant or Guarantor, or be obligated by applicable law to repay to Tenant or Guarantor, any amounts previously paid, then this Guaranty shall be reinstated in the amount Landlord repays or is so obligated to repay. If all or any part of the Lease is rejected, disaffirmed or otherwise avoided pursuant to applicable law affecting creditors' rights, then Guarantor shall, and does hereby (without the necessity of any further agreement or act), assume all obligations and liabilities of Tenant under the Lease to the same extent as if Guarantor were originally named Tenant under the Lease and there had been no such rejection, disaffirmance or avoidance. Guarantor shall upon Landlord's request promptly confirm in writing such assumption.

Guarantor will within ten (10) business days after Landlord's request, furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Guarantor or Guarantor's accountants and any other financial information or summaries that Guarantor typically provides to its lenders or shareholders.

This Guaranty shall be governed by the laws of the jurisdiction in which the Project is located, may not be modified or amended except by a written agreement duly executed by the parties, and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. Any references in this Guaranty to "Tenant" shall include the named Tenant and its trustee in bankruptcy, receiver, conservator, and other successors and assigns.

Guarantor's liability under this Guaranty is direct and primary, and not secondary, and shall be joint and several with that of Tenant. Landlord may proceed against Guarantor under this Guaranty without initiating or exhausting any remedy against Tenant and may proceed against Tenant and Guarantor separately or concurrently. All remedies afforded to Landlord by reason of this Guaranty are separate and cumulative. Guarantor waives any right it may have to require Landlord to institute or prosecute an action against Tenant or any other person before proceeding against Guarantor.

Any notice which Landlord may elect to send shall be binding upon Guarantor if mailed or emailed to Guarantor's address set forth below or to the last address known to Landlord, by United States certified or registered mail, return receipt requested, or by Federal Express or other overnight courier.

In the event of any litigation arising out of or related to this Guaranty: (i) Guarantor consents to the exclusive personal jurisdiction and venue of the courts of the State of Florida sitting in the County in which the Project is located, and (ii) the prevailing party shall be entitled to recovery attorneys' fees and costs incurred pre-litigation and in all courts.

All sums past due hereunder shall bear interest at the lesser of 18% or the highest amount permitted by applicable law, which rate shall also be applicable to any money judgment entered in Landlord's favor against Guarantor, notwithstanding the fact that applicable law may provide for a lower rate of interest on such judgment.

Exhibit B

# EXHIBIT "B"

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into by and between WMG Medley Owner, LLC ("Landlord"), DAX International Brokers, Inc. ("Tenant"), and Diego Capurro ("Guarantor") (Landlord, Tenant, and Guarantor are collectively referred to as the "Parties" and individually referred to as the "Party").

## RECITALS

WHEREAS, Landlord owns the real property located at 8600 NW South River Drive, Medley, Florida 33166 (the "Property");

WHEREAS, Tenant maintains possession of a portion of the Property designated as Unit 7, 8600 NW South River Drive, Medley, Florida 33166 (the "Leased Premises") pursuant to the terms of that certain Lease Agreement dated March 13, 2025, between Landlord, as lessor, and Tenant, as lessee (the "Lease");

WHEREAS, Guarantor executed a Guaranty in connection with the Lease;

WHEREAS, Tenant maintains possession of the Leased Premises;

WHEREAS, Tenant failed to pay rent due and owing to Landlord in the manner required pursuant to the terms of the Lease;

WHEREAS, Landlord filed a Complaint for Eviction against Tenant styled as *WMG Medley Owner, LLC v. DAX International Brokers, Inc.,* currently pending in the County Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, Case No. 2026-011351-CC-05, (the "Lawsuit");

WHEREAS, Tenant and Landlord desire to enter into a payment plan whereby Tenant shall pay Landlord the outstanding amounts owed to Landlord;

WHEREAS, this Agreement in no way releases Tenant from any liability under the Lease, nor does it modify Tenant's obligations under the Lease except as provided in Section 6 herein;

WHEREAS, all Parties and their respective representatives state they are legally competent to execute this Agreement, that all necessary and required authorizations have been obtained, that the legal consequences of their execution of this Agreement have been fully explained to them by their counsel, and that they fully understand those legal consequences.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants contained herein, and for full and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    **Recitals.** The recitals above are true and correct and are incorporated herein and are made part of this Agreement.

2.  **Effective Date of Agreement.** The Effective Date of this Agreement shall be the date on which the last Party executes the Agreement (the "Effective Date"), as indicated by the date below their respective signatures in this Agreement.

3.  **Lease.** Other than set forth in Section 6 of this Agreement, the Agreement does not amend the Lease and is not intended to affect Landlord and Tenant's obligations under the Lease.

4.  **Attorneys' Fees.** Landlord has incurred **$7,500.00** in attorneys' fees and costs in connection with this Lawsuit ("Landlord's Fees"). Tenant agrees to pay Landlord's Fees on or before March 16, 2026, at 5:00 p.m. EST. In the event any Party to this Agreement institutes legal proceedings in connection with, or for the enforcement of this Agreement (including taking any action to obtain the entry of the Final Judgment or any other order or judgment entered pursuant to this Agreement), the prevailing Party in such legal proceedings shall be entitled to recover from the losing Party its reasonable attorneys' fees and costs incurred as a result of such legal proceedings (including at the trial, appellate, and/or bankruptcy levels).

5.  **Payment Plan.** Tenant agrees to pay Landlord the outstanding past due balance owed to Landlord as of the Effective Date of this Agreement for a total sum of **$179,832.00** (the "Debt"). Tenant shall pay Landlord the Debt on the following dates, all before 5:00 p.m. EST on such dates set forth below:

   a. Tenant shall pay Landlord $50,000.00 on or before March 16, 2026;
   b. Tenant shall pay Landlord $5,000.00 on or before March 23, 2026;
   c. Tenant shall pay Landlord $5,000.00 on or before March 30, 2026;
   d. Tenant shall pay Landlord $5,000.00 on or before April 6, 2026;
   e. Tenant shall pay Landlord $5,000.00 on or before April 13, 2026;
   f. Tenant shall pay Landlord $5,000.00 on or before April 20, 2026;
   g. Tenant shall pay Landlord $5,000.00 on or before April 27, 2026;
   h. Tenant shall pay Landlord $5,000.00 on or before May 4, 2026;
   i. Tenant shall pay Landlord $5,000.00 on or before May 11, 2026;
   j. Tenant shall pay Landlord $5,000.00 on or before May 18, 2026;
   k. Tenant shall pay Landlord $5,000.00 on or before May 25, 2026;
   l. Tenant shall pay Landlord $5,000.00 on or before June 1, 2026;
   m. Tenant shall pay Landlord $5,000.00 on or before June 8, 2026;
   n. Tenant shall pay Landlord $5,000.00 on or before June 15, 2026;
   o. Tenant shall pay Landlord $5,000.00 on or before June 22, 2026;
   p. Tenant shall pay Landlord $5,000.00 on or before June 29, 2026;
   q. Tenant shall pay Landlord $5,000.00 on or before July 6, 2026; and
   r. Tenant shall pay Landlord $49,832.00 on or before July 20, 2026.

6.  **Rental Installments.** As of April 1, 2026, pursuant to the terms of the Lease, Tenant is required to pay the following amounts to Landlord each month, on or before the first (1st) day of each month: (i) Base Rent of $24,462.50; (ii) Tenant's Proportionate Share of Operating Expenses, which is estimated at $9,785.00 per month for calendar year 2026, and which is only an estimate and subject to the annual reconciliation set forth in Paragraph 6(a) of the Lease; and (iii) a utility charge for FPL (Florida Power & Light) costs pursuant to Section 7 of the Lease, which vary from month-to-month based on Tenant's usage and is currently billed at the end of each month in arrears

(for example – FPL for the service dates of January 27, 2026 through February 26, 2026 was billed to Tenant on February 27, 2026). Accordingly, Tenant acknowledges that these amounts, including Base Rent, are subject to change based on the terms of the Lease. Tenant shall be permitted to pay the amounts due for its monthly Base Rent, Tenant's Proportionate Share of Operating Expenses and FPL utility charges in four (4) equal payments each month, beginning on April 1, 2026, and continuing on the Monday of each week thereafter for the remainder the Lease term. For purposes of example only, if the total rent due for the month of April 2026 is $36,000.00 for base rent, Tenant's Proportionate Share of Operating Expenses and the FPL utility charge (which will be billed at the end of March 2026), then Tenant would be required to pay: (i) $9,000.00 on or before April 1, 2026; (ii) $9,000.00 on or before April 6, 2026; (iii) $9,000.00 on or before April 13, 2026 and (iv) $9,000.00 on or before April 20, 2026.

This provision is only deemed to modify the terms of the Lease solely as it pertains to the due date of monthly Base Rent, Tenant's Proportionate Share of Operating Expenses and the FPL utility charge for each month. The Parties agree that all other terms or provisions contained in the Lease not discussed herein remain enforceable and unmodified, including, but not limited to, Tenant's obligation to pay the annual reconciliations of Tenant's Proportionate Share of Operating Expenses within the timeframe required pursuant to Paragraph 6(a) of the Lease.

7.      **Security Deposit Payments.**  In addition to the above-referenced payments, Tenant shall continue to pay an additional $500.00 per month, each month, on or before the first of the month towards the Security Deposit, until the full Security Deposit in the amount of $75,000.00 is reached, as set forth on the second (2nd) page of the Lease.

8.      **Method of Payment.** The Debt and Landlord's Fees shall be paid via wire by Tenant to Landlord to the following account, as such account may be modified in the future upon written notice from Landlord to Tenant:

| | |
|---|---|
| Bank Name: | BankUnited |
| | Miami Lakes, FL |
| ABA/Routing Number: | 2670-9059-4 |
| Beneficiary Acct. #: | 9855719664 |
| Beneficiary Name: | WMG MEDLEY OWNER LLC |

9.      **Default.**  In the event Tenant defaults by failing to timely make any payment due under this Agreement, Landlord shall be entitled to: (i) an immediate entry of a Final Judgment for eviction and possession against Tenant; (ii) issuance of a writ of possession; (iii) retake possession on behalf of Tenant; and (iv) an immediate entry of a Final Judgment for damages against Tenant and Guarantor for the full amount owed under the Lease, including accelerated rent, less any payments already made by Tenant, upon the filing of an affidavit of default. No notice, other than a service copy of the affidavit of default sent to Tenant, will be required and no hearing will be required. Tenant and Guarantor agree that in the event of a default, Landlord shall be entitled to an immediate final judgment for damages in the full amount owed under the Lease, including accelerated rent, less any payments already made by Tenant, and Tenant and Guarantor waive any challenges or defenses to entry of such judgment.

10.    **Dismissal.** Upon timely receipt of the payments identified in Sections 4 and 5(a) of this Agreement, Landlord's counsel shall file in the Lawsuit the *Joint Stipulation of Dismissal without Prejudice* and submit to the Court the proposed *Agreed Order of Dismissal without Prejudice*, attached as **Exhibit A**.

11.    **Entire Agreement; Modification.** This Agreement sets forth the terms of the entire agreement between the Parties concerning the Lawsuit It is understood that if this Agreement is not executed by the Parties, the terms of this Agreement shall be null, void, ineffective, and unenforceable. No oral statement of any person whatsoever shall in any manner or degree modify or otherwise affect the terms and provisions of this Agreement. To the extent the terms of this Agreement and any other agreement conflict, the terms of this Agreement shall govern and supersede such inconsistent terms.

12.    **Negotiation and Drafting of Agreement.** The Parties to this Agreement have had the right and opportunity to negotiate the terms of this Agreement and agree that this Agreement shall not be construed as drafted solely by any particular Party hereto. Rather, this Agreement shall be construed as mutually agreed upon terms which were the product of good faith and arms' length negotiations between equal parties. The Parties agree that this Agreement is not unconscionable, unfair, the product of unfair bargaining power, or a contract of adhesion. The Parties have each had the opportunity to consult with their respective counsel concerning this Agreement.

13.    **Severability.** This Agreement and each of its parts shall be severable and, if any provision is determined to be void, invalid, or unenforceable, the remainder of this Agreement shall be fully enforced without such term(s).

14.    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of, as applicable, the Parties' respective parent(s), subsidiaries, affiliates, beneficiaries, successors, assigns, heirs, estates, and representatives.

15.    **Governing Law.** This Agreement shall be performed, interpreted, and enforced according to the laws of the State of Florida without regard to any choice of law provisions thereof.

16.    **Venue.** The Parties agree that all actions and proceedings arising out of or relating directly or indirectly to this Agreement shall be litigated solely and exclusively in Miami-Dade County, Florida.

17.    **Authority.** The Parties represent that each has full right and authority to effectuate the settlement set forth herein and that no other party's consent is required in connection with the effectiveness of the release.

18.    **Representations.** There have been no representations, express or implied, other than as set forth in this Agreement. No Party has been induced to enter into this Agreement by any representation not expressed herein. The undersigned have each read, understand and agree to the terms of this Agreement as evidenced by their signatures below.

19.    **Waiver of Jury Trial. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION TO ENFORCE, OR ARISING UNDER, THIS AGREEMENT.**

20.    **<u>Time is of the Essence.</u>** Time is of the essence as to all obligations under this Agreement.

21.    **<u>Captions.</u>** The captions and headings contained in this Agreement are for convenience of reference only and shall not be construed as limiting or defining in any way the provisions of this Agreement.

22.    **<u>Counterparts.</u>** This Agreement may be signed in counterparts. An e-mail copy of a signature shall be deemed an original for all purposes.

[*signatures to follow*]

Docusign Envelope ID: 8CC41C97-68D2-477A-953A-5D86FC8D73B8

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Agreement as of the respective dates written below.

**WMG Medley Owner, LLC**

Signed by:

Signature: _Anthony Scavo_
751EA1CB7C774C6...

Printed Name: Anthony Scavo

Title: Chief Operating Officer

Date: 3/13/2026

**DAX International Brokers, Inc.**

Firmado por:

Signature: _Diego Capurro_
3EF90A0541B4417...

Printed Name: Diego Capurro

Title: Director

Date: March 13, 2026

**Diego Capurro**

Firmado por:

Signature: _Diego Capurro_
3EF90A0541B4417...

Date: March 13, 2026

Docusign Envelope ID: 8CC41C97-68D2-477A-953A-5D86FC8D73B8

# EXHIBIT A

IN THE COUNTY COURT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

WMG Medley Owner, LLC,

      Plaintiff,                                   CASE NO.: 2026-011351-CC-05

v.

DAX International Brokers, Inc.,

      Defendant.

_____/

## <u>JOINT STIPULATION OF DISMISSAL WITHOUT PREJUDICE</u>

Plaintiff WMG Medley Owner, LLC and Defendant DAX International Brokers, Inc., by and through undersigned counsel, stipulate and agree:

1. The parties have agreed to dismiss this action in its entirety without prejudice.

2. Defendant has agreed to pay Plaintiff's attorneys' fees and costs incurred in connection with this action, as set forth in the Parties' Settlement Agreement.

3. The Parties respectfully request that the Court enter an Agreed Order of Dismissal without Prejudice, with the Court retaining jurisdiction to enforce the Settlement Agreement as necessary to effectuate the terms of the Settlement Agreement.


Dated:_____, 2026


**SHUTTS & BOWEN LLP**
*Counsel for Plaintiff*
525 Okeechobee Boulevard, Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 835-8500
Facsimile: (561) 650-8530

By: /s/
    **Matthew S. Sackel**
    Florida Bar No.: 0017903
    Email: msackel@shutts.com
    **Kendall H. Bennett**
    Florida Bar No.: 1031873
    Email: kbennett@shutts.com

**BILU LAW, P.A.**
*Counsel for Defendant*
2760 W. Atlantic Blvd.
Pompano Beach, FL 33069
Telephone: (954) 596-0669
Facsimile: (954) 427-1518

By: /s/
    **Ron S. Bilu**
    Florida Bar No.: 0632651
    Emails: rbilu@bilulaw.com;
nrossoletti@bilulaw.com;
avalencia@bilulaw.com;
genesis@bilulaw.com

IN THE COUNTY COURT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

WMG Medley Owner, LLC,

      Plaintiff,                        CASE NO.: 2026-011351-CC-05

v.

DAX International Brokers, Inc.,

      Defendant.

_____/

## AGREED ORDER ON JOINT STIPULATION OF DISMISSAL WITHOUT PREJUDICE

THIS CAUSE having come before the Court upon the Parties' *Joint Stipulation of Dismissal without Prejudice*, and the Court having reviewed the Stipulation and being duly advised in the premises, it is hereby ORDERED and ADJUDGED that:

1. All claims in this action are hereby dismissed without prejudice.

2. The Court reserves jurisdiction to enforce the Settlement Agreement and to enter such additional orders and award additional relief to effectuate the terms of the Settlement Agreement.

3. Defendant has agreed to pay Plaintiff's attorneys' fees and costs incurred in connection with this lawsuit, as set forth in the Parties' Settlement Agreement.

DONE AND ORDERED in Miami-Dade County, Florida, on this ____ day of _____, 2026.

**Copies furnished to:**

Matthew S. Sackel, Esq., Kendall H. Bennett, Esq., Shutts & Bowen LLP, *Counsel for Plaintiff*, 525 Okeechobee Boulevard, Suite 1100, West Palm Beach, Florida 33401 (kbennett@shutts.com, msackel@shutts.com; mmalpeso@shutts.com); and

Ron S. Bilu, Esq., Bilu Law, P.A., *Counsel for Defendant*, 2760 W. Atlantic Blvd., Pompano Beach, FL 33069 (rbilu@bilulaw.com; nrossoletti@bilulaw.com; avalencia@bilulaw.com; genesis@bilulaw.com).